CHELSEA NEIGHBORHOOD ASSOCIA-
TIONS et al., Plaintiffs,

v.

UNITED STATES POSTAL SERVICE and
E. T. Klassen, Individually and as
Postmaster General, Defendants.

· No. 74 Civ. 3702.

United States District Court,
S. D. New York.

Feb. 25, 1975.

Berle, Butzel & Kass, New York City, for plaintiffs; Peter A. A. Berle, Peter J. Millock, New York City, of counsel.

Paul J. Curran, U. S. Atty., S. D. New York, New York City, for defendants; John Siffert, New York City, of counsel.

ROBERT J. WARD, District Judge.

Plaintiffs, individuals residing in the Manhattan community of Chelsea and organizations representing different segments of the Chelsea community, move for an order pursuant to Rule 65, Fed.R.Civ.P., granting a preliminary injunction enjoining defendants, United States Postal Service and E. T. Klassen, from proceeding with the construction of a Vehicle Maintenance Facility ("VMF") located in the square block bounded by Ninth and Tenth Avenues and 28th and 29th Streets in Manhattan. Defendants cross-move for an order pursuant to Rules 12(b)(6) and 56, Fed.R. Civ.P., dismissing this action or granting them summary judgment. For the reasons hereinafter stated, plaintiffs' motion is granted and defendants' cross-motion is denied.

The subject matter of this action, as summarized in the Environmental Statement ("EIS") filed by the Postal Service, is the construction

"of a major U. S. Postal Service vehicle maintenance facility (VMF) in combination with a multi-story housing project in the lower West Side of the Borough of Manhattan, New York City. The project will occupy an entire city block, presently vacant, adjacent to the Morgan Station mail processing center. Features of the proposed action are a multi-story VMF, a housing project of approximately 860 units utilizing air rights space above the VMF, and the closure of 29th Street between Ninth and Tenth Avenues to non-postal traffic, except during the evening rush period."

(EIS at 1)

The site of the proposed project is immediately north of Chelsea Park and P. S. 33 and west of the Penn South housing complex at the northern end of the Chelsea residential community. Known as the "Morgan Annex" site, the property was originally acquired by the Post Office Department in 1968 for use as a mail processing annex to Morgan Station. This original plan was abandoned when the Postal Service decided to build a large bulk foreign mail processing facility in Secaucus, New Jersey. Since the demolition of the housing, garages and small manufacturing facilities which occupied the site, the Postal Service has used the property for parking postal trucks, trailer units and employee vehicles.

It appears that the Postal Service began considering construction of a VMF on the Morgan Annex site in 1971. In the fall of that year, Postal Service officials apprised city government officials and congressional representatives of the proposed action. Local citizens and government officials, however, were anxious to obtain the site for residential development. Consequently, on June 16, 1972, Congress enacted Section 6(b) of P.L.

92–313, 86 Stat. 216 which required the Postal Service to grant New York City the air rights over the postal facility at the Morgan Annex site for residential use and to construct its facility in such a manner as to permit this residential construction.[1]

During the early fall of 1972, the Postal Service directed the Army Corps of Engineers, New York District, to prepare an Environmental Statement for the proposed project. The initial draft of this Statement dated December 15, 1972 was released to local interest groups and city officials in January, 1973. Meetings were held and comments were received. The Revised Draft Environmental Statement was issued in November, 1973. This draft was circulated and comments were requested. The Final Environmental Statement, dated March 26, 1974, was submitted to the Council on Environmental Quality which published its receipt on April 8, 1974 in the Federal Register. 39 Fed.Reg. 12783.

The VMF portion of the project will contain approximately 800,000 square feet of multi-story interior space rising approximately 80 feet above street level.

1. Section 6(b) of P.L. 92–313, 86 Stat. 216 provides:

(b) (1) The United States Postal Service shall grant to the City of New York, without reimbursement, air rights for public housing purposes above the postal facility to be constructed on the real property bounded by Twenty-eighth and Twenty-ninth Streets, Ninth and Tenth Avenues, in the City of New York (the Morgan Annex site), such facility to be designed and constructed in such manner as to permit the building by the City of New York of a high-rise residential tower thereon, *Provided,* That—

(A) the City of New York shall grant to the Postal Service without reimbursement exclusive use of Twenty-ninth Street, between Ninth and Tenth Avenues in the City of New York, such use to be irrevocable unless the Postal Service sells, leases, or otherwise disposes of the Morgan Annex site; and

(B) the City of New York shall agree to reimburse the Postal Service for the additional cost of designing and constructing the foundations of its facility so as to ren-

der them capable of supporting a residential tower above the facility, and shall issue any permits, licenses, easements and other authorizations which may be necessary or incident to the construction of the postal facility.

(2) If within twenty-four months after the City of New York has complied with the provisions of paragraphs (A) and (B) of subsection (d)(1) [sic] of this section, the United States Postal Service has not awarded a contract for the construction of its facility, the Postal Service shall convey to the City of New York, at the fair market value, all right, title and interest in and to the above-described real property. Such conveyance shall be made on the condition that such property shall be used solely for public housing purposes, and if public housing is not constructed on the property within five years after title is conveyed to the City of New York or if thereafter the property ever ceases to be used for such purposes, title thereto shall revert to the Postal Service, which shall have the right of immediate reentry thereon.

It will provide parking space for 918 postal vehicles, including 771 trucks, 93 tractors and 24 trailers. The facility is designed to include service and repair bays, wash racks, a paint and body shop, and dispatching and fueling facilities and operations. This VMF will serve all of Manhattan south of 41st Street and the west side of Manhattan north of 41st Street to 134th Street. It will replace three existing Postal Service facilities: Leroy Street Garage, 34th Street Garage and Piers 74–76. Approximately 2,200 postal vehicle movements into and out of the VMF are anticipated on an average weekday with approximately 180 vehicle movements per hour between the hours of five and seven in the morning.

At the time the final EIS was issued, plans for the housing component of the project provided for a total of 864 apartment units divided between two 27 story towers and two low-rise apartment clusters. The towers front Ninth and Tenth Avenues with elevator entrances on each Avenue. Remaining portions of the VMF roof would serve as recreation areas and a plaza for the housing with attendant community services. The proposed housing mix was 60 percent moderate income, 30 percent low income and 10 percent senior citizens.

The housing component and the VMF component are not independent. Together, they comprise what the EIS calls a "structurally integrated VMF-housing project." The VMF is to provide the foundations for the housing and, therefore, determines many aspects of the latter's design. According to the final EIS:

"The configuration of the housing component of the project—that is, high rise apartment towers on the avenues and low-rise units mid-block —has been dictated largely by the interior spatial and circulatory requirements of the VMF."

(EIS VIII–3)

As a result, special accoustical treatment is required to insulate housing units fronting the avenues from unacceptable noise levels. A principal justification for rejection of alternative configurations of the housing component which would require less accoustical treatment was, according to the EIS, that these alternatives would reduce the "efficiency and utility of VMF interior spaces." The VMF is, likewise, structurally dependent upon the housing component. The former must have an exhaust system to control the air quality within the facility. The EIS states at III–19:

"The entire VMF building will be ventilated with exhaust stacks on top of the air rights structure."

On July 15, 1974, the plaintiff Chelsea Neighborhood Associations by letter from its legal counsel made formal demand on the Postal Service to abandon the VMF and convey or lease the site to New York City for strictly residential purposes. Counsel requested that the Service consider another alternative site, "The Yale Express" site. By letter dated August 15, 1974, the Postal Service rejected this demand.

Plaintiffs instituted this action on August 26, 1974 seeking a declaration that in proceeding with construction of the VMF, the Postal Service violated the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA") and the Clean Air Act, 42 U.S.C. § 1857 et seq., an injunction against construction of the facility until there is compliance with these laws and mandamus requiring the Postal Service to develop information on an alternate site for the VMF and reevaluate whether the VMF is needed and should be built.

The complaint alleges that the Postal Service consistently used the housing as a justification for the construction of the VMF without considering the environmental impact of the housing, improperly segmenting the project and thereby violating NEPA. It alleges further violations of NEPA in that the EIS, which was filed, failed to consider other construction projects scheduled in and around the Chelsea community, treating the VMF in isolation; inaccu-

rately represented the noise and air pollution that would result from the VMF; and inadequately discussed feasible alternatives. The complaint alleges violations of the Clean Air Act in that air pollution from the VMF, in cumulation with that from other sources, will result in violations of primary standards for health protection promulgated by the United States Environmental Protection Administration. It, also, alleges violation of this statute in the failure to obtain a state indirect source permit. The complaint, also, alleges that the Postal Service violated 39 U.S.C. § 101(g) in refusing to consider what is alleged to be the less costly Yale Express garage.

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 39 U.S.C. § 409.

Plaintiffs' motion for a preliminary injunction presents most of the issues raised by the complaint. Defendants' cross-motion to dismiss, or in the alternative for summary judgment, urges that neither NEPA nor the Clean Air

Act apply to the Postal Service and that, if these statutes do apply, the Service has violated neither in connection with the planned construction of the VMF. Defendants do not contest plaintiffs' standing to raise these issues except the alleged violation of 39 U.S.C. § 101(g).

The threshold question presented is whether the Postal Service is subject to NEPA. The defendants argue that 39 U.S.C. § 410 [2] exempts the Postal Service from the requirements of NEPA.

Only one case appears to have squarely dealt with whether the Postal Service is exempt from NEPA by virtue of § 410. In City of Thousand Oaks v. United States et al., Civil No. 74–2186 (C.D. Cal. Sept. 3, 1974), the district court concluded that as NEPA was not one of the specific exceptions enumerated in § 410(b), § 410(a) exempted the Postal Service from the application of NEPA. In a brief *per curium* order, the United States Court of Appeals for the Ninth Circuit, affirmed the judgment of the

---

2. Section 410 provides, in pertinent part:

§ 410. *Application of other laws*

(a) Except as provided in subsection (b) of this section, and except as otherwise provided in this title or insofar as such laws remain in force as rules or regulations of the Postal Service, no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5, shall apply to the exercise of the powers of the Postal Service.

(b) The following provisions shall apply to the Postal Service:

(1) section 552 (public information), section 3110 (restrictions on employment of relatives), section 3333 and chapter 71 (employee policies) and 73 (suitability, security, and conduct of employees), and section 5520 (withholding city income or employment taxes), and section 5532 (dual pay) of title 5, except that no regulation issued under such chapters or sections shall apply to the Postal Service unless expressly made applicable;

(2) all provisions of title 18 dealing with the Postal Service, the mails, and officers or employees of the Government of the United States;

(3) section 107 of title 20 (known as the Randolph-Sheppard Act, relating to vending machines operated by the blind);

(4) the following provisions of title 40:

(A) sections 258a–258e (relating to condemnation proceedings);

(B) sections 270a–270e (known as the Miller Act, relating to performance bonds);

(C) sections 276a–276a–7 (known as the Davis-Bacon Act, relating to prevailing wages);

(D) section 276c (relating to wage payments of certain contractors);

(E) chapter 5 (the Contract Work Hours Standards Act); and

(F) chapter 15 (the Government Losses in Shipment Act);

(5) the following provisions of title 41:

(A) sections 35–45 (known as the Walsh-Healey Act, relating to wages and hours); and

(B) chapter 6 (the Service Contract Act of 1965); and

(6) sections 2000d, 2000d–1–2000d–4 of title 42 (title VI, the Civil Rights Act of 1964).

district court dismissing the action. However, the Court stated:

> "We do not approve the basis upon which the trial court dismissed. . . ."

The Court of Appeals affirmed the judgment of dismissal on the ground that the negative statement by the Postal Service was sufficient to show no environmental impact. City of Thousand Oaks v. United States et al., Docket No. 74–2685 (9th Cir. October 1, 1974). In light of the summary nature of the affirmance, the decision in *City of Thousand Oaks, supra,* is of limited precedential value in resolving the question before this Court. It does, however, suggest that defendants' reliance on § 410 for relief from the requirements imposed by NEPA is misplaced. Such a conclusion is buttressed by the decision in Maryland National Capital Park and Planning Commission v. United States Postal Service, 159 U.S.App.D.C. 158, 487 F.2d 1029 (1973). There, the court concluded that unless the environmental problems posed by the building of a Bulk Mail Center lacked "significance" a full impact statement under NEPA "would seem to be indicated." *Id.* at 1041. The decision implies that NEPA would be fully applicable to the Postal Service. However, as the § 410 exemption is not discussed in the decision, it is not dispositive of the question now before this Court.

In order to resolve this question, it is first necessary to ascertain the purposes of NEPA. These are unequivocally declared in 42 U.S.C. § 4321 which states:

> The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

NEPA, also, expressly committed the Federal Government to environmental protection as a matter of national policy. 42 U.S.C. § 4331 provides:

> (a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

> (b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

> > (1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

> > (2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

> > (3) attain the widest range of beneficial uses of the environment without degradation, risk to health

or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

Thus, "NEPA, first of all, makes environmental protection a part of the mandate of every federal agency and department." Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1112 (1971). The direction to consider environmental values contained in NEPA and the broad application of the Act is plainly stated in 42 U.S.C. § 4332:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and *public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter*, and (2) *all agencies of the Federal Government shall* . . . . (emphasis added)

comply with the stringent procedural requirements of that section. Thus, the language of the Act clearly makes it applicable to *all* agencies of the Federal Government. The Council on Environmental Quality ("CEQ") has issued guidelines for the implementation of the Act. 40 C.F.R. § 1500 (1974). The CEQ construes § 4332(2)(C) of the Act

as applicable to all agencies of the Federal Government and that the phrase "to the fullest extent possible" in § 4332 is "meant to make clear that each agency of the Federal Government shall comply with that section unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible." 40 C.F.R. § 1500.4 (1974). In *Calvert Cliffs'*, the court reached a similar conclusion. It stated that "the Section 102 duties are not inherently flexible. They must be complied with to the fullest extent, unless there is a clear conflict of *statutory* authority." 449 F. 2d at 1115 (footnote omitted).

Therefore, it becomes necessary to examine 39 U.S.C. § 410 to determine whether that statute clearly conflicts with NEPA, expressly prohibits or makes compliance impossible. At the outset, the Court notes that the statute does not exempt the Postal Service from *all* federal laws *except* those enumerated in § 410(b). Rather, it makes inapplicable to the Postal Service only those federal laws "dealing with public or Federal contracts, property, works, officers, employees, budgets or funds . . . ." 39 U.S.C. § 410(a). These are words of limitation.

On its face, NEPA is a law dealing with environmental protection, not with contracts, property, employees or funds *per se*. The action forcing provisions of 42 U.S.C. § 4332(2)(C) apply to "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment . . . ." Although contracts, property, employees and funds may be incidentally involved in "actions" subject to NEPA, NEPA does not deal with or regulate these. Its scope is much broader. For example, it applies to internal agency rules and regulations. 42 U.S.C. § 4333. *See, e. g., Calvert Cliffs' supra*. It applies to agency research and development programs. *See, e. g.,* Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission, 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973). It

applies whenever an agency of the federal government makes a decision which enables others to take action which affects the environment. *See id.* at 1088–89. The common denominator is that all of these actions have an impact on the environment.

There is nothing in the language of § 410 on its face which prohibits or makes impossible application of such a broad expression of overriding national policy as NEPA.

Moreover, if further evidence of the extent of the § 410(a) exemption is needed, it is provided by examination of the subsection (b) exceptions. All of these relate to statutes which specifically deal with contracts, property, works, employees and funds.[3]

If § 410 was meant to be accorded the broad interpretation urged upon this Court by the defendants, it would have been unnecessary to include the specific exception for the Administrative Procedure Act ("APA") within subsection (a). Under accepted rules of statutory construction, the specific exception of a statute of such general applicability as the APA would preclude including other statutes of general applicability not specifically named or described in the statute.

Furthermore, 42 U.S.C. § 4332 mandates that this Court construe 39 U.S.C. § 410 in a manner which is consistent with the policies of NEPA. In light of the congressional policy expression contained in 42 U.S.C. § 4331 and the extensive operations of the Postal Service which may have significant impact on the environment, it would be a violation of § 4332 to construe § 410 more broadly than is required by its literal terms.

The defendants rely heavily on the legislative history of the Postal Reorganization Act in support of their argument that NEPA is inapplicable to the Postal Service. The Court has reviewed the legislative history and finds nothing therein which would support the defendants' contention. That history, as well as the legislation enacted, evinces concern only with removing the Postal Service from partisan politics, reorganizing its management and financial structure and providing parity with the private sector for employees in terms of wages and labor-management relations. It was hoped that as a result of these changes the Postal Service could operate in a more efficient and business-like manner. *See* H.R.Rep.No.91–1104, Conf. Rep.No.91–1363, 91st Cong. 2d Sess. (1970), U.S.Code Cong. & Admin.News, p. 3649.

Requiring the Postal Service to comply with NEPA, in the context of this litigation, is in no way inconsistent with the Postal Service mandate. 39 U.S.C. § 101(g) provides, in part, "In planning and building new postal facilities, the Postal Service shall emphasize the need for facilities and equipment designed to create desirable working conditions for its officers and employees . . . ." It would hardly be consistent with this duty to ignore the environment in which new facilities will be built and the environmental conditions these facilities create.

■ The only case cited to the Court in support of defendants' contention is Cohen v. Price Commission, 337 F.Supp. 1236 (S.D.N.Y.1972). Although not conclusively deciding the issue, Judge Weinfeld held that it was unlikely that NEPA applied to the Price Commission because it was a temporary agency whose effectiveness was dependent upon its ability to act expeditiously. This is not the case with the Postal Service. The latter is a permanent establishment engaged in long-range planning and action in almost every populated area in the country. Accordingly, the Court holds that the Postal Service is subject to NEPA.

---

3. 39 U.S.C. § 410(b)(6) excepts Title VI of the Civil Rights Act of 1964. However, all the provisions of this Act speak in terms of the federal provision of financial assistance and contracts. As has already been noted, nothing in NEPA speaks in such terms.

■ The defendants concede that the VMF is a major federal action significantly affecting the environment. Therefore, in view of the Court's holding that the Postal Service is subject to NEPA, a detailed environmental impact statement is required. The defendants also concede that the EIS filed does not completely analyze the environmental impact of the housing. Nonetheless, they argue that the Final EIS fully complies with NEPA.

At the outset, the Court notes that, throughout the EIS, the housing project is cited as one of the primary benefits to be derived from the construction of the VMF.[4] It was a major factor in the rejection of other alternatives.[5] In essence, defendants argue that they were justified in considering the beneficial aspects of the housing but they were not required to detail its environmental impact because (1) the housing is too speculative and remote; (2) the Postal Service has no responsibility for the housing; and (3) eventually HUD will prepare an EIS for the housing.

Defendants' argument that the housing component is too speculative and remote to require an analysis of its environmental impact, at this time, reveals a significant omission in the EIS—the failure to mention the possibility that the housing project may never be built. Indeed, there is much to indicate that this might well be the case. The EIS notes that noise levels at the site are "unacceptable," by HUD standards, for new housing construction.[6] It, therefore, notes that extensive accoustical treatment will be required if these standards are to be met, including air conditioning consuming 2500 kilowatts of electricity. There is no discussion as to whether the cost of providing these noise reducing features will render the development of low—and moderate—income housing economically unfeasible. HUD, in its comment letter, specifically requested that this be considered and discussed in the final impact statement.[7]

The failure to discuss in any meaningful fashion the economic feasibility of providing the accoustical treatment re-

4. Some examples are:
"The most significant impact of the project is the positive response to a pressing and obvious need for low—and moderate—income housing in the area."
(EIS at 3)
"Most importantly, the proposed project is a response to a pressing local housing need . . ."
(EIS at III–36)
"It is the conclusion of this Statement that the net effect of project development is positive, as it represents an improvement of Postal Service operations as well as a much needed source of low—and moderate—income housing for the Chelsea-Clinton community."
(EIS at III–36)

5. "Alternatives to the proposed action have been considered and the conclusion reached. that the proposed action is the most feasible course for the Postal Service to pursue. Moreover, it is the most advantageous to the community in providing a needed potential source of housing."
(EIS at 4)

6. The letter from Margaret M. Myerson to F. R. Pagano, dated February 8, 1974, containing the Department of Housing and Urban Development comments on the Revised Draft EIS states:
"Not only would it appear that the portion of the site fronting on Ninth Avenue will fall into HUD's 'unacceptable' category because the 24-hour cumulative noise exposure will exceed 80 db(A) for 60 minutes post-VMF development, but we also anticipate 'unacceptable' levels of intrusive noise on the 29th Street side of the proposed housing site to be generated by the combination of 2,200 daily postal vehicle (trucks) movements into and out of VMF and an additional 1,023 daily PMC vehicle movements into and out of the Morgan Station truck loading docks facing the VMF across 29th Street, especially in view of 'the use of the street for manuevering,' as described on page I–5 of the draft statement."

7. The letter from HUD, note 6, *supra*, specifically stated that the final statement should indicate "whether the accoustical treatment proposal . . . is financially feasible for the proposed subsidized housing project."

quired is significant in that it renders the impact statement inadequate by virtue of its failure to fully disclose to all interested parties the very real possibility that the housing may not and cannot be built. Indeed, the New York City Housing & Development Administration ("HDA") pointed out, and the EIS duly noted, that the draft statement was misleading in that HDA could not commit itself to building the housing absent federal funds. HUD further requested that the final impact statement discuss an alternative means to vent the VMF exhaust fumes in the event that the housing was not built. The United States Environmental Protection Administration ("EPA"), also, noted that the discussion of alternatives failed to consider the environmental impact of construction of the VMF without the housing and suggested such a consideration be included. 40 C.F.R. § 1500.10(a) requires that

> "where opposing professional views and responsible opinion have been overlooked in the draft statement and are brought to the agency's attention through the commenting process, the agency should review the environmental effects of the action in light of those views and should make a meaningful reference in the final statement to the existence of any responsible opposing view not adequately discussed in the draft statement, indicating the agency's response to the issues raised."

See also, Silva v. Lynn, 482 F.2d 1282, 1285 (1st Cir. 1973).

■ The EIS did not make a meaningful response to the issues raised by the comments of HDA, EPA and HUD. NEPA's requirement of a detailed impact statement "seeks to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance." Calvert Cliffs', supra 449 F.2d at 1114. Certainly, the real possibility of the VMF standing without the housing would alter the environmental impact and the cost-benefit analysis. Although the EIS noted what the carbon monoxide levels would be without the housing, it continued to treat this as a temporary condition. It did not alter its cost-benefit analysis or its discussion of alternatives to consider the project without the housing.

■ At a minimum, NEPA is an "environmental full disclosure law" Silva v. Lynn, supra 482 F.2d at 1285; Monroe County Conservation Council, Inc. v. Volpe, 472 F.2d 693, 697 (2d Cir. 1972). Given that there is a substantial possibility that the housing portion may never be built, the EIS is inadequate in that it fails to mention, let alone discuss in detail, this possibility and its consequences.

The second and third arguments raised by the defendants, in support of the adequacy of the EIS, point up another defect of major proportion in the EIS —the failure to consider the environmental impact of the housing at this time.

■ It is now clear that NEPA "requires that agencies of the Federal government consider the impact of an overall program and not just isolated aspects of facilities." Atchison, Topeka and Santa Fe Railway Co. v. Callaway, 382 F.Supp. 610, 620 (D.D.C.1974) (footnote omitted). Recognizing that the fundamental policies of NEPA would be frustrated if decisions ultimately involving significant environmental impact were to take place in an incremental and piecemeal fashion, the courts have required increasingly broad assessments of potential future actions in connection with any action taken in furtherance of future potential development. See, e. g., The Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, 508 F.2d 927 (2d Cir. 1974); Indian Lookout Alliance v. Volpe, 484 F.2d 11 (8th Cir. 1973); Scientists' Institute for Public Information, Inc., supra;

Greene County Planning Board v. Federal Power Commission, 455 F.2d 412 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). Defendants seek to distinguish these authorities on two grounds. First, they argue that an EIS will eventually be prepared for the housing by HUD and to prepare one now would be premature. Second, they argue that the VMF has independent utility and, thus, they were permitted to segment the project and restrict their EIS to the VMF. Neither argument is persuasive.

■ A primary purpose of NEPA is to consider long-range effects and examine environmental consequences before there are "irreversible and irretrievable commitments of resources." *See* The Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, 362 F.Supp. 627 (D.Vt.1973), aff'd, 508 F.2d 927 (2d Cir. 1974). To this end, the CEQ guidelines provide:

"The objective of section 102(2)(C) of the Act and of these guidelines is to assist agencies in implementing these policies. This requires agencies to build into their decisionmaking process, *beginning at the earliest possible point,* an appropriate and careful consideration of the environmental aspects of proposed action in order that adverse environmental effects may be avoided or minimized and environmental quality previously lost may be restored."

40 C.F.R. § 1500.1(a) (emphasis added).

"*As early as possible* and in all cases prior to agency decision concerning recommendations or favorable reports on proposals for (1) legislation significantly affecting the quality of the human environment (see §§ 1500.5(i) and 1500.12) (hereafter 'legislative actions') and (2) all other major Federal actions significantly affecting the quality of the human environment (hereafter 'administrative actions'), Federal agencies will, in consultation with other appropriate Federal State and local agencies and the public assess in detail the potential environmental impact."

40 C.F.R. § 1500.2(a) (emphasis added).

"It is important that draft environmental statements be prepared and circulated for comment and furnished to the Council *as early as possible* in the agency review process in order to permit agency decisionmakers and outside reviewers to give meaningful consideration to the environmental issues involved. In particular, agencies should keep in mind that such statements are to serve as the means of assessing the environmental impact of proposed agency actions, rather than as a justification for decisions already made. This means that draft statements on administrative actions should be prepared and circulated for comment prior to the first significant point of decision in the agency review process."

40 C.F.R. § 1500.7(a) (emphasis added).

The thrust of the cases and the CEQ guidelines is that NEPA analysis should take place at a point when a commitment of resources is made which forecloses other options. As has been noted, the design and construction of the VMF is largely determinative of the configuration of the housing which can be built. Moreover, the building of the VMF forecloses the option of building the housing at grade level. Thus, now is the time to consider the environmental effect of the housing component, rather than after the VMF is constructed and flexibility is lost.

■ That HUD will eventually prepare an EIS is not sufficient to relieve the Postal Service from its obligation. *See* National Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972). The CEQ has recognized that projects often will involve more than one agency and in its guide-

lines it has provided for this contingency. 40 C.F.R. § 1500.7(b) states:

"Where more than one agency (1) directly sponsors an action, or is directly involved in an action through funding, licenses, or permits, or (2) is involved in a group of actions directly related to each other because of their functional interdependence and geographical proximity, consideration should be given to preparing one statement for all the Federal actions involved (see § 1500.6(d)(1)). Agencies in such cases should consider the possibility of joint preparation of a statement by all agencies concerned, or designation of a single 'lead agency' to assume supervisory responsibility for preparation of the statement. Where a lead agency prepares the statement, the other agencies involved should provide assistance with respect to their areas of jurisdiction and expertise. *In either case, the statement should contain an environmental assessment of the full range of Federal actions involved, should reflect the views of all participating agencies, and should be prepared before major or irreversible actions have been taken by any of the participating agencies.* Factors relevant in determining an appropriate lead agency include the time sequence in which the agencies become involved, the magnitude of their respective involvement, and their relative expertise with respect to the project's environmental effects. As necessary, the Council will assist in resolving questions of responsibility for statement preparation in the case of multi-agency actions. Federal Regional Councils, agencies and the public are encouraged to bring to the attention of the Council and other relevant agencies appropriate situations where a geographic or regionally focused statement would be desirable because of the cumulative environmental effects likely to result from multi-agency actions in the area." (emphasis added)

The Postal Service has made no attempt to comply with this guideline nor has HUD given environmental clearance for this project. After the VMF is built, for the reasons noted above, preparation of an EIS by HUD may well be a "hollow exercise." *See Calvert Cliffs', supra* 449 F.2d at 1128.

The second argument proffered by defendants, that the VMF has independent utility, is equally without merit since no EIS for the VMF, standing alone, was ever filed.

■ Throughout the EIS, the VMF and the housing are described as one project. They were presented to the public in that fashion. The Postal Service, having used the housing as a major justification for the VMF and as a principal benefit to be derived therefrom, cannot now eschew its responsibility for fully disclosing and evaluating the environmental impact of the combined project. *Cf.,* Named Individual Members of the San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013 (5th Cir. 1971), cert. denied, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972).

In Sierra Club v. Callaway, 499 F.2d 982 (5th Cir. 1974), cited by defendants, the court considered the following factors relevant to the determination of whether a portion of a project could be segmented for NEPA purposes: the scope of the entire project, the timing of the construction of the various elements of the project and the interdependence of the components of the project. Considering each of these criteria, the defendants' argument must fail. First, the scope of the project is small—one square block. Indeed, both components of the project will occupy the same square footage. As envisaged in the EIS, construction is to be consecutive, or as nearly consecutive as possible. Most important, however, as previously noted, the two projects are structurally interdependent.

Thus, the Court holds that an EIS must be filed which fully discloses and evaluates the negative and positive environmental impact of both the VMF and the housing.

The defendants make one further argument which merits discussion. They argue that the EIS did address the environmental impact of the housing, albeit incompletely, in a manner which was reasonably adequate. The EIS did consider traffic associated with cars expected to be owned by residents of the housing. However, the Court notes that the EIS did not address itself to a number of other factors. For example, a housing complex of this size will require supporting services such as maintenance, garbage disposal, fuel deliveries and other commercial services attendant upon residential usage. The generation of this sort of traffic is nowhere considered. Much of this will be additional truck traffic. The resultant noise and air pollution is not considered, nor is the effect such traffic will have on the operations of the VMF.

The EIS, also, discusses the housing project impact on health, school, and park facilities, as well as, public utilities. From the limited discussion, it is apparent that school and park facilities will be overburdened.

Suffice to say that what is not discussed is as relevant as what is, for nothing less than "full *consideration*" can satisfy NEPA. *Calvert Cliffs', supra* 449 F.2d at 1128. The Court does not presume to dictate all that should be included in an EIS in order to give "full *consideration*" to the environmental impact of the housing.

However, the Court notes that nowhere does the EIS give meaningful consideration to the problems posed by such high density dwellings, containing large open space, completely isolated from the surrounding environment. *See, e. g.,* J. Jacobs, The Death & Life of Great American Cities (1961). These are problems which will affect both the project residents and the Chel-

sea neighborhood in general. For example, crime and crime control are problems which have an environmental impact which must be considered in detail. *See* Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973). 42 U.S.C. § 4332(A) requires that the Postal Service take an interdisciplinary approach using the social sciences in decision making of the sort here contemplated. Such an approach is lacking in the EIS prepared by the Postal Service and renders it inadequate.

There is another respect in which the EIS is procedurally inadequate and fails to comply with NEPA— the discussion of alternatives. The Court has already noted one alternative which is completely omitted—the VMF without housing. However, the EIS is inadequate in its discussion of the alternatives it does mention. As the Court said in *Monroe County Conservation Council, Inc., supra* 472 F.2d at 697–98:

"The statement makes passing mention of possible alternatives to the proposed action . . . but it does so in such a conclusory and uninformative manner that it affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives. *The requirement for a thorough study and a detailed description of alternatives, which was given further Congressional emphasis in § 4332(2)(D), is the linchpin of the entire impact statement.* Without the detailed statement the conclusions and decision of the agency appear to be detached from and unrelated to environmental concerns, *see,* Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 833–837 (1972); *see also,* Greene County Planning Bd. v. Federal Power Comm., 455 F.2d 412, 419 (2 Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). *Consideration, of course, must also be given to the feasibility and impact of the abandonment of the project. Calvert Cliffs'*

*supra*, 449 F.2d at 1114; *Seaborg, supra*, 463 F.2d at 787." (footnote omitted) (emphasis added)

"Passing mention" in a "conclusory and uninformative manner" precisely describes the discussion of the "NO ACTION"[8] and "SCATTER SITE" alternatives. Neither furnish any data or information to support the conclusions drawn. Such a deficiency renders an EIS fatally inadequate. *See, e. g., Monroe County Conservation Council, Inc., supra*; Silva v. Lynn, *supra* 482 F.2d at 1286–87; *Atchison, Topeka and Santa Fe Railway Co., supra* 382 F.Supp. at 623; I–291 Why? Association v. Burns, 372 F.Supp. 223, 247–53 (D.Conn.1974).

▮ Defendants argue that their discussion of alternatives is reasonable and they need not set forth in the EIS detailed statements concerning alternatives which they know to be inadequate. It is true that the requirement of a detailed discussion of alternatives is subject to a construction of reasonableness. Life of the Land v. Brinegar, 485 F.2d 460 (9th Cir. 1973). However, all this means is that "there is no need for an EIS to consider an alternative whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative." *Id.* at 472. Neither of these criteria apply to the "NO ACTION" and "SCATTER SITE" alternatives. The discussion of alternatives need not be exhaustive; however, "[w]hat is required is information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned." *Natural Resources Defense Council, Inc., supra* 458 F.2d at 836. In determining when an EIS contains sufficient information, it should be kept in mind that one of the fundamental purposes of the "detailed statement" requirement is to "insure the integrity of the process of decision" (Silva v. Lynn, *supra* 482 F.2d at 1285)

and "[provide] evidence that the mandated decision making process has in fact taken place" for the agency decision makers, other interested agencies, and the public at large. *Calvert Cliffs', supra* 449 F.2d at 1114. This evidence is absent in the instant case. The EIS indicates that postal vehicles will travel an additional 580 miles daily by abolishing the Leroy Street facility and relocating the vehicles serviced there to the VMF. In light of this fact, the conclusory statements of the EIS with respect to the "NO ACTION" and "SCATTER SITE" alternatives do not give this Court sufficient information, with regard to the basis for the choice to build the VMF, to conclude that a reasoned decision was in fact made.

▮ NEPA requires a careful and informed decision making process and its procedural requirements must be strictly complied with. *Calvert Cliffs', supra.* Accordingly, the Court has concluded that the Postal Service has failed to comply with these procedural requirements.

Inasmuch as it is clear that plaintiffs have standing, the only question remaining is whether a preliminary injunction should issue.

▮ Applying the settled rule that "a preliminary injunction should issue only upon a clear showing of . . . probable success on the merits *and* possible irreparable injury," (Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (2d Cir. 1973)), the Court holds that plaintiffs have made a strong showing that they will probably succeed on the merits. Moreover, unless they immediately receive the "relief they are entitled to, there is danger that it will be of little or no value to them or anyone else when finally obtained." Lathan v. Volpe, 455 F.2d 1111, 1117 (9th Cir.

---

8. The discussion of the "No Action" alternative is, also, misleading. It assumes that under this alternative housing would not be developed on the site. Such is not the case. P.L. 92–313 § 6(b)(2) specifically provides

that the Postal Service shall convey the Morgan Annex site to the City, if a contract for the construction of its facility is not awarded by the Service within two years.

1971). The letting of a contract for construction is imminent and unless enjoined the Postal Service will irrevocably commit itself to the building of the VMF, at which point preparation of an adequate EIS would be a hollow exercise. Therefore, plaintiffs are entitled to a preliminary injunction enjoining defendants from proceeding with construction of the VMF.

Settle order on notice.