753 F.2d 120
 22 ERC 1199, 243 U.S.App.D.C. 302
 SIERRA CLUB, a nonprofit California corporation, Petitioner,
v.
The UNITED STATES DEPARTMENT OF TRANSPORTATION; the Federal
Aviation Administration; Elizabeth Hanford Dole,
individually and as Secretary of the U.S. Department of
Transportation; J. Lynn Helms, individually and as
Administrator of the Federal Aviation Administration;
Frontier Airlines, Inc., a Nevada Corp.; Jackson Hole
Airport Board, an agency organized under the laws of the
State of Wyoming, Respondents.
SIERRA CLUB, a nonprofit California corporation, Petitioner,
v.
The UNITED STATES DEPARTMENT OF TRANSPORTATION; the Federal
Aviation Administration; Elizabeth Hanford Dole,
individually and as Secretary of the U.S. Department of
Transportation; J. Lynn Helms, individually and as
Administrator of the Federal Aviation Administration;
Western Airlines, Inc., a Delaware Corporation; Jackson
Hole Airport Board, an agency organized under the laws of
the State of Wyoming, Respondents.
 Nos. 83-1832, 83-1877.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 7, 1984.
Decided Jan. 25, 1985.
 
 Petitions for Review of Orders of the Federal Aviation administration.
 Howard I. Fox, Washington, D.C., for petitioner. H. Anthony Ruckel, Denver, Colo., also entered an appearance for petitioner.
 
 
 1
 J. Carol Williams, Atty., Dept. of Justice, Washington, D.C., with whom Peter R. Steenland, Jr., Atty., Dept. of Justice, Kenneth N. Weinstein and Debra A. Weiner, Attys., Dept. of Justice, Washington, D.C., were on brief, for federal respondents. Nancy B. Firestone and Martin W. Matzen, Attys., Dept. of Justice, Washington, D.C., also entered appearances for federal respondents.
 
 
 2
 David N. Brictson, Denver, Colo., and Joseph B. Goldman, Washington, D.C., were on brief, for respondent, Frontier Airlines, Inc.
 
 
 3
 Thomas G. Allison, Bradley M. Martin, Seattle, Wash., and Jonathan Blank, Washington, D.C., were on the brief, for respondent, Western Airlines.
 
 
 4
 J. Michael Morgan, Denver, Colo., was on brief, for respondent, Jackson Hole Airport Board.
 
 
 5
 Before MIKVA, BORK and STARR, Circuit Judges.
 
 
 6
 Opinion for the Court filed by Circuit Judge BORK.
 
 BORK, Circuit Judge:
 
 7
 The Federal Aviation Administration ("FAA"), in two orders dated March 22, 1983 and June 23, 1983, Joint Appendix ("J.A.") at 65, 305, amended the operations specifications of Frontier Airlines, Inc., and Western Airlines, Inc. The amending orders granted permanent authorizations to operate Boeing 737 ("B-737") jet airplanes out of Jackson Hole Airport, which is located within the Grand Teton National Park in Wyoming. Frontier and Western are the only major commercial air carriers that schedule flights to and from Jackson Hole Airport. The Airport is operated under a special use permit granted to the Jackson Hole Airport Board by the FAA. Petitioner, Sierra Club, a national conservation organization, incorporated under the laws of the State of California, seeks review of these orders. Respondents are the FAA, the Department of Transportation, the Jackson Hole Airport Board, Frontier Airlines, and Western Airlines. We have consolidated these cases and take jurisdiction under 49 U.S.C. Sec. 1486 (1982).
 
 
 8
 Sierra Club alleges that the FAA improperly granted the operations amendments without filing an Environmental Impact Statement ("EIS") as required by the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. Sec. 4332(2)(C) (1982). Further, Sierra Club complains that the FAA has permitted a "use" of national parkland without considering possible alternatives, a violation of the Transportation Code, 49 U.S.C. Sec. 303(c) (1982). Because we find that the FAA operated well within its discretion in granting the permanent authorization to operate B-737 jet airplanes out of the Airport and that the increased noise levels due to the employment of those airplanes do not constitute a "use" under section 303(c), the decision of the FAA is affirmed.
 
 I.
 
 9
 The Jackson Hole Airport was established by the Town of Jackson in 1939. Before that, there had been a single dirt runway at the location. By 1941, the Airport had established commercial operation with Western Airlines flying DC-3 propeller aircraft. The land on which the Airport is situated and much of the other land in the same valley were donated to the federal government in 1943, and were designated Jackson Hole National Monument. Proclamation No. 2578, 57 Stat. 731 (1943). In 1950 the Jackson Hole National Monument was merged with the adjacent national park to form the Grand Teton National Park. 16 U.S.C. Sec. 406d-1 (1982). As a result, Jackson Hole Airport is now the only airport in this country located within the boundaries of a national park and has regularly scheduled commercial flights. Over a number of years, Congress has appropriated funds for the expansion and improvement of the Airport's facilities.[1]
 
 
 10
 Since 1955 the Airport has been operated under a special use permit executed by the Department of the Interior's National Park Service. The original permit had a twenty-year term, and an option for an additional twenty years was later executed by the Park Service and accepted by the Jackson Hole Airport Board.
 
 
 11
 Prior to 1981, the two major commercial airlines serving the Airport--Frontier and Western--used only propeller aircraft to serve Jackson Hole. Private jets, however, frequently flew into the Airport. In 1978, Frontier applied to the FAA for permission to fly B-737 jet airplanes into the park. Frontier was then conducting 1,599 flights per year with Convair 580 ("C-580") aircraft. These flights carried just over 45,000 passengers annually. Pursuant to NEPA, 42 U.S.C. Sec. 4321 et seq. (1982), the FAA prepared an EIS to examine the proposal to use jet aircraft.
 
 
 12
 The EIS, issued in 1980, detailed the proposed authorization, its impact on the environment, and any possible alternatives or mitigating measures. Final Environmental Impact Statement for Amendment of Operations Specifications Frontier Airlines, Inc., Boeing 737 Service to Jackson, Teton County, Wyoming (Jackson Hole Airport) (Nov. 18, 1980) ("1980 EIS"); J.A. at 377. The EIS was based in part on prior studies of the Airport's impact on the environment by Dr. Sam D. Hakes, Dean of the College of Engineering at the University of Wyoming. His first survey, made in 1975, involved 7,500 to 10,000 individual noise measurements taken at 50 monitoring sites. S. Hakes, J. Steadman & G. Engen, A Noise Level Study on the Snake River in Grand Teton National Park 1 (1975) ("Hakes 1975"); J.A. at 553. The testing involved private jets, commercial propeller aircraft and a special test using a B-737. Id. at 5-7; J.A. at 557-59. The study found that private aircraft caused between "four [and ten] times the number of significant noise intrusions [in much of the park] as do the commercial aircraft." Id. at 65; J.A. at 624. A comparison between C-580 propeller aircraft and an environmentally modified B-737 jet aircraft revealed that those planes were "very comparable ... for noise intrusion when landing." Overall, however, the 737 was found to be "slightly noiser [sic] than the CV580 but substantially quieter than the private jets." Id. at 66; J.A. at 625. The study pointed out though that "[t]he route flown by the B737 was chosen to be the particular route that would cause the greatest intrusion." Id. Noise intrusions, however, could be reduced significantly by having the commercial airplanes take a preferred route. It was concluded that during more than 90% of the year meteorological conditions would permit takeoffs to the south, which "would greatly reduce the noise intrusion in the study area caused by all commercial operations." Id. at 67; J.A. at 626.
 
 
 13
 In addition to the Hakes 1975 study, the EIS relied on another study by Dr. Hakes completed in 1978. S. Hakes, Noise Study Jackson Hole Airport (Sept. 1978) ("Hakes 1978"); J.A. at 498. This study was designed to measure the noise impact of C-580, B-737, and other aircraft during controlled and uncontrolled routing and to operate as a logical extension of the Hakes 1975 study. Id. at 1, 24; J.A. at 500, 523. The study examined the noise intrusions at eighteen sites, each varying in its level of environmental sensitivity. Id. at 13-14; J.A. at 512-13. Similar to the finding in the Hakes 1975 study, noncommercial flights were found to cause over 75% of the noise intrusions. Id. at 24, 29; J.A. at 523, 528. The comparison between the C-580 and B-737 airplanes again showed that, in terms of noise, the planes were relatively interchangeable as long as landing and takeoffs were made to the south. All in all, Hakes concluded, if correct routes were flown, there would be "little to be gained or lost if either aircraft is used for commercial operations at the Jackson airport." Id. at 40; J.A. at 539. And, since the B-737 has almost twice the seating capacity of the C-580, any increase in noise intrusion attributable to the B-737 could be more than overcome by the smaller number of flights needed to accommodate the same number of passengers. Id. at 41; J.A. at 540.
 
 
 14
 Using these studies and data concerning each aircraft derived from noise tests conducted by the FAA and the flight manuals and other information from the manufacturer, the agency determined that the Hakes studies were accurate. 1980 EIS at 11-15; J.A. at 398-402. The EIS, like the Hakes studies, used a "worst case" scenario to determine environmental impact. In analyzing a situation with an hypothesized 1985 calendar year passenger demand and where all C-580 aircraft would be replaced by B-737s, the EIS concluded that there would be a cumulative increase of approximately 1 Ldn (cumulative day-night sound level in decibles ("dbl")) near the airport and 0.5 Ldn beyond 20,000 feet. Id. at 19; J.A. at 406. "Cumulative noise differences of 1 decibel [sic] are not usually considered significant." Id. at 22; J.A. at 409. After reviewing the FAA's findings, the Secretary of Transportation, on December 24, 1980, issued a final record of decision amending Frontier's operations specifications to allow use of regularly scheduled B-737s for a period of two years.
 
 
 15
 The Department of the Interior and the Environmental Protection Agency objected to the authorization of B-737 jet airplanes as permitting too much noise. Letter of Jan. 9, 1981 from Administrator of the EPA to Chairman of Council on Environmental Quality; J.A. at 791. This inter-agency dispute was referred to the Council on Environmental Quality ("CEQ") by the EPA and the Department of the Interior for resolution under authority granted in 40 C.F.R. Sec. 1504.1(a) (1981). CEQ was established to resolve inter-agency disagreements over proposed federal actions that might cause unsatisfactory environmental effects. CEQ's negotiations with the agencies led to a compromise and then to a revised final decision by the Department of Transportation on January 16, 1981. Final Record of Decision, Amendment of Frontier Airlines' Operations Specifications for Boeing 737 Jet Service, Jackson Hole Airport, Wyoming (Jan. 16, 1981); J.A. at 637. This decision allowed the use of B-737 airplanes for a period of two years. A renewal of the operations specifications of Frontier was not to be granted unless the FAA would agree to "cooperate with local sponsors in seeking alternative sites to provide commercial air service to Jackson and the adjacent park areas." Id. at 3; J.A. at 639.
 
 
 16
 Prior to approval of temporary authority of B-737 aircraft, the Airport Board had adopted a voluntary noise abatement plan. Jackson Hole Airport Noise Abatement Plan (Apr. 25, 1980); J.A. at 182. The plan called for (1) routing of aircraft to approach and leave the Airport away from the noise-sensitive areas of the Park; (2) requesting aircraft to maintain a minimum altitude of 3,000 feet if it became necessary to fly over the Park; (3) adjusting runway use and traffic patterns to minimize noise impact on the Park; (4) requesting all users of the Airport "to execute noise abatement approaches and departures," and to include these requests in the Airport's ground-to-pilot broadcasts. Id. at 2-4; J.A. at 183-185. The Plan also provided for implementation, ongoing public and pilot education, monitoring, research, and enforcement to assist in the noise abatement program of the Airport. Id. at 4-9; J.A. at 185-90.[2]
 
 
 17
 In November, 1982 the Airport Board proposed to the Secretary of the Interior a new special use permit to replace the current one that was due to expire in 1995. After considering the 1980 EIS, preparation of an Environmental Assessment ("EA"), J.A. at 111, and voluntarily going beyond the required analysis by compiling for the record more extensive data on noise impact, Further Analysis Augmenting the Environmental Assessment for the Proposed Renegotiation of Management Agreement with the Jackson Hole Airport Board (Apr. 1983); J.A. at 244, the new Secretary of the Interior agreed to renegotiate the special use permit. As a result, the special use permit was reconstructed to provide for a thirty-year term, with two ten-year renewal options and a potential expiration date in the year 2033. Agreement Between the United States Department of the Interior and the Jackson Hole Airport Board (Apr. 27, 1983); J.A. at 222. This, in effect, was an abandonment of the Secretary's position in the compromise decision of January 16, 1981 requiring that the FAA seek an alternative site for commercial air service to the area. See supra p. 124. As part of the new special use permit, the Airport Board agreed to keep the existing noise abatement plan in effect and complete a revised noise abatement program that would "ensure that future airport operations are controlled in such a manner that aircraft noise exposure will remain compatible with the purposes of Grand Teton National Park and will result in no significant increase in cumulative or single event noise impacts on noise sensitive areas of the Park." Id. at 4; J.A. at 225. The agreement also mandates the establishment of cumulative noise standards with 45 dbl (Ldn) and 55 dbl (Ldn) noise contours and single event noise standards not to exceed 92 dbls. Id. at 5-8; J.A. at 226-29.
 
 
 18
 The Airport Board and the Town of Jackson Hole have gone beyond these measures to assist in curbing unnecessary noise. The Town has passed an ordinance requiring compliance with the single event noise standard in the April 27, 1983 agreement. Jackson, Wyo., Ordinance No. 309. Violation of this ordinance is punishable by fine or imprisonment. The Airport Board has adopted a further rule which places a ceiling of an average of six daily departures on commercial jet aircraft. Interim Rule Regarding Scheduled Commercial Jet Aircraft Operation 2 (June 9, 1983); J.A. at 220.
 
 
 19
 Following approval of the new special use permit, Frontier Airlines applied to the FAA for a renewal of its authority to fly B-737 airplanes into Jackson Hole Airport. J.A. at 11. An EA was prepared that, in addition to the usual analysis, used the noise screening test of the Civil Aeronautics Board ("CAB") to determine whether potential increases in the 1980 EIS level of B-737 flights would have a significant impact. The Secretary of Transportation, after finding that no significant impact would result, granted the renewal on a permanent basis. 48 Fed.Reg. 6228 (1983). Frontier was also required to accept certain noise abatement conditions. Specifically, Frontier agreed to (1) restrict flights to the hours between 6:00 a.m. and 9:30 p.m., (2) fit all B-737 aircraft used at the Airport with quiet nacelles, and (3) comply with noise abatement procedures during landings and takeoffs. Id. at 6231; 47 Fed.Reg. 50,155, 50,156 (1982). Later, on petition by Western Airlines, the FAA similarly amended that company's operating specifications--after complete analysis of the 1980 EIS and a new EA and Finding of No Significant Impact--to allow for B-737 airplane service. Revised Operations Specifications, Western Airlines, Jackson Hole, Wyoming Airport (June 23, 1983); J.A. at 305.
 
 
 20
 Sierra Club seeks review of the FAA orders granting Frontier and Western's requests.
 
 II.
 
 21
 As a preliminary matter, the government contends that the present litigation is barred by this court's decision in Sierra Club v. United States Department of Transportation, 675 F.2d 1340 (D.C.Cir.1982), which affirmed the FAA's use of the 1980 EIS and the resulting decision to grant temporary use of Jackson Hole Airport by B-737 jet airplanes. Brief of Federal Respondents at 31. Because that decision was rendered without opinion and dealt only with temporary authorization of commercial jets, its bearing on this case is unclear and we give it no weight in reaching our decision.
 
 
 22
 The validity of the new special use permit extended the use of the Airport for eighteen years beyond the current permit with options for two additional ten-year extensions. The validity of these extensions is currently the subject of litigation in Sierra Club v. James G. Watt and Jackson Hole Airport Board, Civ. No. 83-406 (D.Wyo. filed Oct. 5, 1983). Although the issues there do not directly concern this appeal, it should be noted that a ruling on the new special use permit could ultimately affect whether any aircraft can be flown into Grand Teton National Park after the original permit's expiration in 1995. The issues before this court are different from those posed in the Wyoming litigation.
 
 III.
 
 23
 The Sierra Club petition presents two issues. First, whether the FAA erred by finding agency action had "no significant impact" on the environment so that preparation of a new EIS was unnecessary. Second, whether the FAA violated section 303(c) of the Transportation Code by not fully considering every alternative to use of the parkland and not using all possible means to "minimize harm to the park."
 
 A.
 
 24
 We do not think the FAA violated NEPA by failing to prepare an additional EIS. Under NEPA, an EIS must be prepared before approval of any major federal action that will "significantly affect[ ] the quality of the human environment." 42 U.S.C. Sec. 4332(2)(C) (1982). The purpose of the Act is to require agencies to consider environmental issues before taking any major action. See generally S.Rep. No. 296, 91st Cong., 1st Sess. (1969); H.R.Rep. No. 378, 91st Cong., 1st Sess. (1969); H.R.Conf.Rep. No. 765, 91st Cong., 1st Sess. (1969); 1969 U.S.Code Cong. & Ad.News 2751-73. Under the statute agencies have the initial and primary responsibility to determine the extent of the impact and whether it is significant enough to warrant preparation of an EIS. This is accomplished by preparing an EA.[3] 40 C.F.R. Sec. 1501.4(b), (c) (1984). An EA allows the agency to consider environmental concerns, while reserving agency resources to prepare full EIS's for appropriate cases. If a finding of no significant impact is made after analyzing the EA, then preparation of an EIS is unnecessary. 40 C.F.R. Sec. 1501.4(e). An agency has broad discretion in making this determination, and the decision is reviewable only if it was arbitrary, capricious or an abuse of discretion. Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678, 681 (D.C.Cir.1982); Izaak Walton League v. Marsh, 655 F.2d 346, 371-72 (D.C.Cir.), cert. denied, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981); Committee for Auto Responsibility v. Solomon, 603 F.2d 992, 1002 (D.C.Cir.1979), cert. denied, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980).
 
 
 25
 This court has established four criteria for reviewing an agency's decision to forego preparation of an EIS. First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum. Sierra Club v. Peterson, 717 F.2d 1409, 1413 (D.C.Cir.1983); Cabinet Mountains, 685 F.2d at 681-82.
 
 
 26
 The first test is not at issue here. Both the FAA and Sierra Club have identified the relevant environmental concern as noise by jet aircraft within Grand Teton National Park. The real issues raised by Sierra Club are whether the FAA took a "hard look" at the problem, and whether the methodology used by the agency in its alleged hard look was proper.
 
 
 27
 We find that the FAA did take a hard look at the problem. The FAA properly prepared an EA to examine the additional impact on the environment of the plan. This EA went forward from the 1980 EIS. An EIS is the highest level of environmental review that is given by the agency. See supra note 3. The 1980 EIS, which was based on extensive research by Dr. Hakes of the University of Wyoming, noise testing by the FAA, and data derived from manufacturer information, showed that noise intrusions of B-737 jets over the level caused by C-580 propeller aircraft amounted to only 1 Ldn near the Airport and decreased in proportion to the distance from the Airport. See supra p. 123. The agency, exercising its expertise, has found that an increase this minute is not significant for any environment. See 1980 EIS at 22; J.A. at 409. In addition, the EIS and the Hakes studies were based on a worst case scenario, and it was determined that if certain precautions were taken the actual noise levels could be diminished greatly. See supra p. 123.
 
 
 28
 The EA, analyzing whether the grant to Frontier of an amendment to its operations specifications would have a significant impact, was based on the 1980 EIS, the results of a CAB noise screening test and the Final Report to Jackson Hole Airport Board on Aviation Noise South of Airport (Mar. 14-22, 1981). Environmental Assessment and Finding of No Significant Impact (Frontier) (Oct. 22, 1982); J.A. at 69. The EA also considered the various alternatives to the proposal. See EA (Frontier), at Attachment 3, J.A. at 97. The CAB noise test had a low threshold for determining whether there was significant change from the 1980 EIS. The criteria required that there be at least "a 17% increase in the area affected (approximately equal to a 1 decibel increase in cumulative noise)" for a finding of a significant impact. EA (Frontier) at 2; J.A. at 70. The tests found, however, that the changes requested by Frontier would only amount to "a 12.8% increase in area impacted by aircraft noise over that analyzed in the EIS." EA (Frontier) at 2 & Attachment 1; J.A. at 70, 76-78. Because this was well below the threshold figure, the agency found no significant impact to warrant a new EIS. The Final Report by Dr. Hakes also involved extensive tests, mostly in the residential districts south of the Airport. He concluded that "[t]he measurements demonstrate the accuracy of earlier tests, as well as predictions of expected levels that were made available to the public." EA (Frontier), Attachment 2, at 11; J.A. at 96.
 
 
 29
 The EA prepared to examine the impact of Western's request for an amendment to operations based its finding of no significant impact on the Agreement Between the United States Department of the Interior and the Jackson Hole Airport Board (Apr. 27, 1983); J.A. at 222. In that agreement, based on the findings of a separate EA, see Environmental Assessment (Jackson Hole Airport Board) (Jan. 1983); J.A. at 111, and further analysis after receiving comments, see Further Analysis Augmenting the Environmental Assessment for the Proposed Renegotiation of Management Agreement with the Jackson Hole Airport Board (Apr. 1983); J.A. at 244, a 55 dbl (Ldn) noise contour was established which reached beyond the "noise sensitive areas of the park." EA (Western) at 1; J.A. at 208. The agency found no significant impact because the Western request fell within the ceiling for scheduled operations previously found to be acceptable as causing no significant impact to the surrounding areas. EA (Western) at 4; J.A. at 211.
 
 
 30
 Sierra Club supports its argument that the FAA has not met its burden by a challenge to the agency's methodology in preparing the 1980 EIS and the more recent EAs. Petitioner contends that the use of cumulative noise level analysis rather than individual event noise level analysis is unacceptable. Brief of Petitioner at 23-26. The FAA adopted cumulative noise level analysis to satisfy the Aviation Safety and Noise Abatement Act of 1979, 49 U.S.C. Sec. 2102 (1982), which calls for establishment of a uniform test for all airport compatibility plans. 14 C.F.R. Sec. 150.9 (1984). It is clearly within the expertise and discretion of the agency to determine proper testing methods. We find no abuse of discretion in the choice of the cumulative noise level analysis methodology. Using this standard, the impact of additional B-737 flights out of Jackson Hole Airport accounted for less than a 1 dbl rise in the cumulative noise level. EA (Frontier) at 2; J.A. at 70. A rise of less than 1 dbl is considered insignificant under agency regulations for any environment. We have no basis for thinking that judgment unreasonable.
 
 
 31
 Petitioner argues that because Jackson Hole Airport is located within national parkland and a different standard--i.e., individual event noise level analysis--is mandated. Brief of Petitioner at 15-18. Both individual event and cumulative data were amassed in preparing the 1980 EIS on which the EAs were based. 1980 EIS; J.A. at 377. FAA regulations, however, require that the findings be evaluated cumulatively. Policies and Procedures for Considering Environmental Impacts: FAA Order 1050.1C, 45 Fed.Reg. 2244, 2250 (1980). The fact that the agency in exercising its expertise relied on the cumulative impact levels as being more indicative of the actual environmental disturbance is well within the area of discretion given to the agency. See Ethyl Corp. v. EPA, 541 F.2d 1, 12 & n. 16 (D.C.Cir.), cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976); Nader v. Schlesinger, 609 F.2d 494 (Temp.Emer.Ct.App.1979). We agree with petitioner that although noise is a problem in any setting, "airplane noise is fundamentally inconsistent with the type of recreational experience Park visitors are seeking" and should be minimized. Brief of Petitioner at 17. However, the use of either an individual or cumulative standard of measurement only indicates the noise level; it does not interpret the impact. That is left to the judgment of the agency. Here the FAA found that a cumulative noise increase of 1 dbl or less is not significant--even for the pristine environment in which the Jackson Hole Airport is located. This finding is especially strong when, as here, the numbers are based on a "worst case" scenario. See supra p. 123.
 
 
 32
 Sierra Club also argues that the FAA did not consider weather and terrain effects on noise level impact. It alleges that, if these effects were taken into account, the noise levels would be significantly increased. Brief of Petitioner at 26-29. Sierra Club bases its complaint on the findings of Dr. James D. Foch, Jr., Associate Professor, Department of Aerospace Engineering Sciences, University of Colorado. Dr. Foch argued, among other things, that,
 
 
 33
 Significant temperature inversions are a common morning occurrence around Jackson Hole Airport and in Grant Teton National Park.... For morning Boeing 737 operations ... I estimate the magnitude of the effect to be [an increase of] 10 to 15 dB.
 
 
 34
 ... When a Boeing 737 takes off to the south into the wind, the wind "carries" the sound northward to the Park. I estimate the magnitude of this enhancement to be at least 5 dB on the average.
 
 
 35
 The east side of the Teton Range presents one of the most precipitous mountain fronts in the world, and constitutes a colossal array of acoustic reflectors. These reflectors produce echos [sic] which increase aircraft sound levels.... It is difficult to estimate this effect in general, although it could be calculated approximately for any particular site. Assuming Phelps Lake is a typical site, and using my own measurements there, I estimate this increase due to terrain to be at least 5 dB.
 
 
 36
 Foch, Quantitative Estimates Memorandum (June 24, 1983); J.A. at 870.
 
 
 37
 Whether Dr. Foch's estimates are correct is not the issue here. The question is whether Dr. Foch's estimates show that the FAA's conclusion must be rejected by this court. We think not. Most of Dr. Foch's concerns are already accounted for in the 1980 EIS and the Hakes Studies through the use of actual on site noise measurements. See 1980 EIS; J.A. at 377; Hakes 1978 at 4-14; J.A. at 503-13 (noise monitoring at 18 new sites); Hakes 1975 at 1; J.A. at 553 (between 7,500 and 10,000 individual noise measurements taken at 50 monitoring sites). The FAA is not, in any event, required to accept every possible method of collecting and analyzing data. When a court considers the sufficiency of an agency's environmental analysis, "the court is not to rule on the relative merits of competing scientific opinion." Committee for Nuclear Responsibility, Inc. v. Seaborg, 463 F.2d 783, 787 (D.C.Cir.1971). The agency is entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances. The court's responsibility lies in assuring that the agency had before it all the data to make an informed decision that adequately took account of the important environmental concerns. Id. We find that the FAA fully evaluated the environmental consequences of its action and that the agency's decision was not arbitrary, capricious, or an abuse of discretion.
 
 
 38
 Even if we were to find that the increase in noise level approached a significant level, it should be noted that the FAA has met the fourth test of Cabinet Mountains by imposing several noise abatement conditions on the use of the airport to alleviate as much of the remaining noise problem as possible. These conditions include retaining three of the original operational conditions: the imposition of an 8.6% climb gradient, a limitation on the hours the Airport can be used, and a requirement that the B-737s be fitted with quiet nacelles to reduce the noise of the aircraft. 48 Fed.Reg. 6228, 6231 (1983); 47 Fed.Reg. 50,155, 50,156 (1982). In addition, a voluntary pilot program was established that encourages pilots to approach and leave the Airport using a route that would have the least noise impact on the park. The Town of Jackson has assisted in implementing the noise abatement program by passing laws against infractions of the noise abatement plan. Jackson, Wyo., Ordinance No. 309. A study by the Airport Board indicates that there has been a high degree of compliance with the noise abatement procedures--including the voluntary ones. J.A. at 177. In all these matters the FAA has acted responsibly to minimize the impact on the environment.
 
 
 39
 Given all of these facts, we think the FAA was not required to prepare yet another EIS before granting permanent authorizations for the use of B-737s.
 
 B.
 
 40
 Sierra Club also alleges that the FAA violated section 303(c) of the Transportation Code. That section provides that,
 
 
 41
 The Secretary may approve a transportation program or project requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if--
 
 
 42
 (1) there is no prudent and feasible alternative to using that land; and
 
 
 43
 (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.
 
 
 44
 49 U.S.C. Sec. 303(c) (1982).
 
 
 45
 The Secretary determined that section 303(c) did not apply to the approval of the proposed amendments to the operations specifications. 1980 EIS at 73-74; J.A. at 464-65. Whether a section 303(c) statement should have been prepared turns on whether the increased noise of jet over propeller airplanes constitutes a "use" of parkland. Sierra Club cites several cases seeking to meet the use requirement by imposing on our fact situation a doctrine of "constructive use." Brief of Petitioner at 38-40. These cases are inapposite. Each either involves a new and actual use of parkland,[4] or activity on adjoining land that would have a severe physical impact on the parkland.[5]
 
 
 46
 The legislative history indicates that section 303(c) was adopted "to insure that in planning highways, railroad rights-of-way, airports and other transportation facilities, care will be taken, to the maximum extent possible, not to interfere with or disturb established recreational facilities and refuges." See S.Rep. No. 1659, 89th Cong., 2d Sess. 6 (1966). Congress desired that the effect on parkland and other recreational facilities be fully considered during the planning stages of major new physical "facilities." Congress gave no indication that section 303(c) was intended to create ongoing review of relatively minor changes in the operational characteristics of an established transportation facility. The land to be used in this case has already been used as an airport for over forty-five years. It has been used by commercial aircraft for forty-three years and commercial jet aircraft for at least two years. In addition, private jets, which create far more cumulative noise than commercial jets have been using the Airport for years. It can hardly be expected, once an airport has been in operation, that every change in flight scheduling or operations must be accompanied by a 303(c) statement. Such insignificant adjustments do not constitute the type of "use" of parkland contemplated by section 303(c). Cf. Adler v. Lewis, 675 F.2d 1085, 1092 (9th Cir.1982) (the action must "substantially impair the value of the site in terms of its prior significance and enjoyment"). A contrary view of the statute would produce a blizzard of useless 303(c) statements.
 
 The orders of the FAA are hereby
 
 47
 Affirmed.
 
 
 
 [1]
 In 1966 and 1972, for example, Congress approved funds that allowed the Airport Board to broaden and reinforce the runway, construct a parallel taxiway, improve the parking and access to the Airport, and provide for a new instrument landing system. Pub.L. No. 89-763, 80 Stat. 1313 (1966); S.Rep. No. 1462, 89th Cong., 2d Sess. (1966); Pub.L. No. 92-184, 85 Stat. 640 (1972)
 
 
 [2]
 The Plan also included construction of an air traffic control tower. This aspect of the Plan was eliminated when the FAA found it not to be cost-beneficial. Letter of Director, FAA to Manager, Jackson Hole Airport, May 18, 1981. J.A. at 105
 
 
 [3]
 The FAA's environmental review process consists of a three-stage analysis of the agency action. Policies and Procedures for Considering Environmental Impacts: FAA Order No. 1050.1C, 45 Fed.Reg. 2244 (1980) (FAA regulation implementing NEPA pursuant to 40 C.F.R. Sec. 1500 et seq. (1979)). First, if the proposed action is "categorically excluded" from NEPA requirements, the agency is not required to undertake additional examination. Such actions include,
 [o]perating specifications and amendments thereto which do not significantly change the character of the operational environment of the airport, including authorizing alternative use of an airport, new use of an airport or administrative revisions to operating specifications.
 
 
 [45]
 Fed.Reg. 2244, 2261 (1980)
 If the action is not categorically excluded, the agency must prepare an Environmental Assessment ("EA") for the following purposes:
 a. To understand the problem and identify reasonable alternative solutions, including the proposed action.
 b. To determine whether any potential impacts are significant, which would trigger the environmental impact statement process.
 c. To provide the basis for the FAA's finding of no significant impact if the proposed action has no significant impacts.
 d. To identify and satisfy special purpose Federal laws, regulations, and executive orders.
 e. To identify and satisfy state and local laws and regulations applicable to the proposal.
 f. In completing the above, to indicate agencies consulted (and to identify cooperating agencies for environmental impact statement preparation purposes).
 Id. at 2251.
 If, after completing the EA, the agency finds that the proposed action would have no significant impact, it must prepare and file a Finding of No Significant Impact. If the agency determines otherwise, an EIS must be prepared. Id.
 Here the respondents claim that the FAA orders qualified as "categorically excluded" and neither NEPA nor controlling agency orders required a further examination of the effects of the agency action. The agency, however, chose to assure the environmental soundness of its action by going one step further and preparing an EA.
 We do not today determine whether the actions undertaken by the FAA were categorically excluded, but limit our review to the sufficiency of the EA in foregoing preparation of an EIS. Since we find the EA adequate, there is no need to address the issue of categorical exclusion.
 
 
 [4]
 Louisiana Environmental Society, Inc. v. Dole, 707 F.2d 116 (5th Cir.1983) (proposed bridge partially situated on parkland); Louisiana Environmental Society, Inc. v. Coleman, 537 F.2d 79 (5th Cir.1976) (same); Coalition for Responsible Regional Development v. Brinegar, 518 F.2d 522, 524 (4th Cir.1975) (same); D.C. Federation of Civic Ass'ns v. Volpe, 459 F.2d 1231, 1236 (D.C.Cir.) (same), cert. denied, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972)
 
 
 [5]
 Adler v. Lewis, 675 F.2d 1085 (9th Cir.1982) (acquisition of land adjacent to park for a highway project); Stop H-3 Ass'n v. Coleman, 533 F.2d 434, 439 (9th Cir.), cert. denied, 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976) (construction of six lane controlled access highway passing within 100-200 feet of petroglyph rock designated for inclusion in National Registry of Historic Places); Brooks v. Volpe, 460 F.2d 1193 (9th Cir.1972) (construction of interstate highway which would encircle a campground); Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, 362 F.Supp. 627, 639 (D.Vt.1973), aff'd, 508 F.2d 927 (2d Cir.1974) (proposed highway to run along border of wilderness area), vacated and remanded on other grounds, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975). See also cases cited supra note 4