VALLEY CITIZENS FOR A SAFE
ENVIRONMENT, Plaintiff,

v.

Edward C. ALDRIDGE, as he is Secretary
of the Air Force, James F. Boatright, as
he is Deputy Assistant Secretary of the
Air Force, Major General Roger Scher,
as he is Commander of the Air Force
Reserve, and Brigadier General Freder-
ick Walker, as he is Commander of the
439th Tactical Airlift Wing at Westover
Air Force Base, Defendants.

Civ. A. No. 87–0130–F.

United States District Court,
D. Massachusetts.

Sept. 29, 1988.

Cristobal Bonifaz, Conway, Mass., for plaintiff.

C. Brian McDonald, Asst. U.S. Atty., Pauline H. Milius, Dept. of Justice, Land and Natural Resources Div., Washington, D.C., Andre M. Kocay, Staff Judge Advocate, USAFR, New Britain, Conn., for defendants.

MEMORANDUM AND ORDER

FREEDMAN, Chief Judge.

### I.

This is an action under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., challenging the defendants' decision allowing the Air Force to locate and operate sixteen C–5A aircraft at Westover Air Force Base in Chicopee, Massachusetts. Plaintiff, Valley Citizens For A Safe Environment, takes exception to this decision, claiming that it was based on an inadequate Final Environmental Impact Statement ("FEIS"). Through this abstraction of inadequacy, plaintiff seeks support for enjoining the C–5As' beddown at Westover.

The case is before the Court on plaintiff's motions for a preliminary injunction and partial summary judgment, and defendants' cross motion for summary judgment. These motions raise three main issues, all involving different aspects of the evaluation conducted in formulating the FEIS. The first is whether defendants gave ample consideration to alternative proposals for the beddown of these aircraft and the adverse climatological factors associated with their placement and operation at Westover. The second is the accuracy of defendants' assessment of the air pollution these aircraft would cause at this location. Finally, plaintiff questions the validity of the methodology defendants used in predicting noise pollution impact on local populations.

The Court must also decide whether a preliminary injunction should issue considering the criteria the First Circuit has enunciated. *Concrete Machinery Co. v. Classic Lawn Ornaments*, 843 F.2d 600, 611 (1st Cir.1988) (citing *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981)).

### II.

The Court views the facts established from the contents of discovery materials in the light most favorable to the party opposing the particular motion for summary judgment on any given ground, "indulging all inferences favorable to" that party. *Kennedy v. Josephthal & Company, Inc.*, 814 F.2d 798, 804 (1st Cir.1987); *Ismert and Associates v. New England Mutual Life Insurance*, 801 F.2d 536, 537 (1st Cir. 1986) (citations omitted). However, the non-moving party has the obligation to set forth specific facts giving "some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim." *Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). "The mere existence of a scintilla of evidence in support of [the non-movant's] position will be insufficient; there must be evidence from which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Likewise, Fed.R.Civ.P. 56(e) has been described as requiring that "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denial, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256, 106 S.Ct. at 2514. Applying these standards, the Court will consider the facts of record to determine whether there is a genuine dispute as to any material fact and whether either party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

In the early 1970's the Air Force's Strategic Air Command located at Westover Air Force Base was replaced by the 439th Tactical Airlift Wing. The B–52 bombers located at Westover were replaced with smaller aircraft. In the process, the Air Force transferred excess facilities and real estate to the local communities. The facilities retained had been designed to support larger aircraft than those subsequently assigned to the Reserve's 439th Tactical Airlift Wing.

In January 1982, the Department of Defense decided to purchase fifty C–5B aircraft to help fill an airlift shortfall. Following the institution of Congressional manpower limits, the Air Force decided to transfer thirty-two C–5As to the Air Force

Reserve and National Guard when the C–5Bs were delivered. Sixteen of the thirty-two C–5As authorized for these components were located at Kelly Air Force Base, Texas. The Air Force evaluated a number of other sites for the remaining C–5As, including: Orlando International Airport, Patrick Air Force Base and Cape Canaveral Air Force Station, all in Florida; Charleston Air Force Base, South Carolina; Hunter Army Airfield, Georgia; and Westover Air Force Base, Massachusetts. Considering the potential for recruiting reservists in the base region, support facilities, cost of required construction, current base use and occupancy, and fuel storage and hydrant facilities, Westover became the preferred site for the sixteen remaining C–5As.

On September 26, 1986, a public scoping meeting was held to determine the issues to be addressed in a draft EIS related to a proposal to locate eight C–5As at Westover and an alternative proposal to locate sixteen C–5As there. On December 5, 1986, a draft EIS was issued and noticed in the *Federal Register*. During the same period, the Westover Metropolitan Development Corporation ("WMDC") sought permission from the Air Force to expand its civil aviation activities at Westover. WMDC's request included a proposal to extend flight time from sixteen hours a day to twenty-four hours a day. The Air Force, therefore, included consideration of the WMDC proposal in the draft and final EISes. This dual review of the C–5A and WMDC proposals made for potential confusion in the FEIS as to which proposal was being addressed in any given section. This problem was caused mainly by the fact that the FEIS addressed many of the same issues—alternative activities, air pollution impact and noise pollution impact—with respect to both the C–5A and the WMDC proposals.

The proposal adopted in the draft EIS was to locate all of the remaining sixteen C–5As at Westover and to increase the hours of operation from sixteen hours a day to twenty-four hours a day. The alternatives considered were: (1) no action (i.e., leave the sixteen C–130s that were then at Westover in place and continue sixteen hours a day airfield operations); (2) leave

the sixteen C–130s in place and increase airlift operations to twenty-four hours a day; and (3) locate only eight C–5As at Westover and relocate the sixteen C–130s.

A public hearing was held on the draft EIS on January 8, 1987. The public comment period began in December and lasted some sixty-eight days. The principal concerns raised were the noise of the aircraft, the environmental impact on Chicopee Memorial State Park and safety. Plaintiff Valley Citizens For A Safe Environment submitted comments on the draft EIS. The Air Force considered questions raised in the comment period and issued the FEIS on April 17, 1987. The availability of the FEIS was noted in the *Federal Register*.

Following the release of the FEIS and based upon the evaluation therein, the Air Force rendered its decision on May 21, 1987, amended June 1, 1987, to place the sixteen C–5As at Westover. This decision noted Westover's long history in the Air Force, its extensive facilities to support large aircraft such as the C–5As and the region's effectiveness in supplying "Reserve manpower and skills requirements and [that] its full potential still remains untapped." Record of Decision at 3. The decision conceded that the "no action" alternative was the environmentally preferred option, but concluded that this alternative would "not adequately meet the operational needs of the Air Force." *Id.* Similarly, the Air Force found that the alternative of locating only eight C–5As at Westover would not be cost effective. This determination was based on the reasoning that the "annual operating cost of a split operation would significantly exceed the cost of operating all sixteen aircraft at Westover AFB." *Id.* The decision also deferred until a later date a determination of whether to allow WMDC's requested increase in the airfield operating hours from sixteen to twenty-four hours per day.

The FEIS considered the alternatives to locating the C–5As at Westover in two respects. First, it considered the alternatives of locating sixteen, eight, or none of the aircraft at Westover. As indicated in the information garnered in the FEIS, the

Air Force decided that for mainly economic and logistical reasons, the beddown of sixteen C–5As at Westover was the preferred option. These reasons included, as noted above, the increased cost of a split operation, the ready availability of a large Reserves recruitment pool and the comparative ease with which Westover could be adapted to facilitate and accommodate these aircraft. Under the second consideration, comparing the advantages of the C–5As' beddown at various Air Force bases, the Air Force decided that these same latter two factors of having a large personnel pool and the adaptability of the base made Westover a better choice than the other bases mentioned.

With regard to the impact of air pollution caused by the beddown of sixteen C–5As at Westover, the FEIS, in comparing the emissions from the operation of the C–130s at Westover, concluded that this military action "would result in a small net decrease in the emission of air pollutants resulting from aircraft operations relative to current operations. The reduction would be small in relation to regional emissions, and effects on regional air quality would likely be undetectable." FEIS at ix.

The FEIS also pointed out that:

The implementation of the proposed (16 C–5A aircraft) military action would result in a decrease in the annual flying hour program from the current level of 6,460 hr. to approximately 4,960 hr. Local flying activity would decrease from the current level of thirty sorties per week to 4 sorties per week. Sortie duration would increase from 2.5 to 5 hr., resulting in a decrease in local flying hours from 75 to 20 per week.[1]

FEIS at iv.

The most significant adverse impact noted in the FEIS from the location of the sixteen C–5As at Westover was increased noise levels, with the primary response being human annoyance. The FEIS observed that increased noise levels could affect current and future land uses (primarily residential development) and could result in decreased property values. The FEIS predicted that the number of persons exposed to noise levels of greater than the maximum level considered acceptable for residential areas without the incorporation of noise attenuation measures would increase from the current level of 100 with the C–130s to approximately 3,550 persons with the C–5As. Approximately thirty of these 3,550 persons would be exposed to noise levels considered discretionarily acceptable for residential areas and approximately 700 would be expected to be highly annoyed. The FEIS also recognized that there may be other persons in the area who would be highly annoyed by aircraft noise. In this regard the FEIS stated that, "[n]oise levels during local training sorties could interfere with activities in which verbal communication is important (such as classroom instruction, business conferences and religious activities) and with listening to television and radio programs or recorded music." FEIS at viii. The FEIS went on to note that "most local flying activity would be scheduled for training weekends and after normal working hours during the week. Thus, residential and recreational uses would likely be affected more frequently than educational or business activities." *Id.*

In deciding, based on the FEIS, to locate the sixteen C–5As at Westover, the Air Force recognized the problems that the noise impact would cause and adopted certain mitigation measures. These included: (1) displacement of the landing threshold on a commonly used runway by 1,200 feet to remove the clear zone for this runway from the high use areas of Chicopee Memorial State Park; (2) raising airfield traffic pattern altitude from 1,200 to 1,500 feet above ground level; and (3) development of an operation and noise mitigation plan at Westover as the Base gains experience with the C–5As.

### III.

■ Having found that the sixteen C–5A proposal constituted a major action that

---

1. A sortie is defined as "one mission or attack by a single plane." Webster's Third New International Dictionary, 2174 (1971).

would significantly affect the quality of the human environment, defendants properly determined that they must conduct an evaluation of the environmental impact by means of the FEIS. 42 U.S.C. § 4332(2)(C); *Sierra Club v. Marsh,* 769 F.2d 868, 870 (1st Cir.1985). A narrow and deferential standard of review then binds the Court in examining this FEIS, assaying its adequacy on any challenged ground. At this point, "the only role for a court is to insure that the agency has considered the environmental consequences; it cannot ' "interject itself within the area of discretion of the executive as to the choice of the action to be taken." ' " *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980) (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976)).

The Court's review is limited to a determination of "whether the agency's findings and conclusions in the EIS are arbitrary, capricious or otherwise not in accordance with law, and whether the agency followed the procedures required by law." *Silva v. Lynn,* 482 F.2d 1282, 1283 (1st Cir.1973) (recognizing the applicability of the standards enunciated in the Administrative Procedure Act, 5 U.S.C. §§ 702 and 706). In this regard, "the standard to be applied in judging NEPA statements is a reasonableness standard ... aimed at insuring a good faith effort by the Agency." *Conservation Law Foundation, Etc. v. Andrus,* 623 F.2d 712, 719 (1st Cir.1979) (citing *Sierra Club v. Froehlke,* 534 F.2d 1289 (8th Cir. 1976) and *Silva,* 482 F.2d at 1282); *see also Roosevelt Campobello Intern. Park v. U.S.E.P.A.,* 684 F.2d 1041, 1045–46 (1st Cir. 1982).

The Court's review is also governed by the "rule of reason." *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1074 (1st Cir.1980). This rule recognizes that "even if there is some minor deficiency in an environmental statement, the presence of such does not suffice to dispense with the traditional role of the court in balancing competing consideration." *Andrus,* 623 F.2d at 719; *see also Metropolitan Edison v. People Against Nuclear Ener-*gy, 460 U.S. 766, 772, 103 S.Ct. 1556, 1560, 75 L.Ed.2d 534 (1983) ("NEPA does not require the agency to assess *every* impact or effect of its proposed action, but only the impact or effect on the environment." (Emphasis in original)). Also, under this rule the Court may not require of the FEIS "a degree of detail too exacting to be realized." *Grazing Fields,* 626 F.2d at 1074.

These standards all apply in determining what are material facts and genuine issues for purposes of the summary judgment analysis. *See* 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* ¶ 56.17[3] (2d ed. 1985). In other words, the summary judgment analysis must be conducted while viewing the case through the lens of this Court's limited scope of review.

The basic requirements of an Environmental Impact Statement are set forth in 42 U.S.C. § 4332(2)(C) which states, in part, that an EIS must be:

[A] detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which can be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.; see also* 40 C.F.R. § 1500 *et seq.* (regulations of the Council on Environmental Quality setting forth the purpose of NEPA and standards for EISes).

Plaintiff challenges this FEIS for failing to adequately consider: (1) the alternatives to the chosen action; (2) the air pollution impact; and (3) the noise pollution impact. The Court will address each of these areas, respectively, as follows.

## A. Alternatives

Plaintiff moved for partial summary judgment based on the FEIS's "inadequate discussion of alternatives to the proposed action, the inadequate discussion of the environmental consequences of the proposed alternatives to the proposed action, and the failure to compare the relative advantages and disadvantages of the various locations that are discussed in the Environmental Impact Statement and the record of decision...." Defendants countered this motion of plaintiff's with a motion for summary judgment, maintaining that the FEIS is adequate with regard to all issues presented.

On the issue of alternatives, plaintiff has argued two points: first, that the FEIS failed to consider the environmental impact of locating the aircraft at the other named bases in order to provide an effective comparison of the relative impact at all bases as may be required under 40 C.F.R. § 1502.14; and secondly, plaintiff contends that the FEIS failed to take account of the increased cost of locating the C–5As at a cold climate base such as Westover.

Considering both of these challenges to the thoroughness of the FEIS's review of alternatives, the guiding posts are the First Circuit's decisions. They state that: "an agency must ... study all alternatives that appear reasonable and appropriate for study at the time...." *Seacoast Anti-Pollution League v. Nuclear Regulatory Commission*, 598 F.2d 1221, 1230 (1st Cir. 1979). This is qualified with the recognition that: "The degree to which any alternative must be discussed must be measured by a 'rule of reason....' Courts cannot force agencies to include within an EIS alternatives too fanciful or hypothetical." *Grazing Fields*, 626 F.2d at 1074 (citing *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council*, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978) and *Commonwealth of Massachusetts v. Andrus*, 594 F.2d 872, 884 (1st Cir.1979)).

With this in mind, the Court will consider plaintiff's first contention in its motion, that defendants failed to adequately discuss the environmental impacts of the C–5As' beddown at the other Air Force bases mentioned.

### 1. Alternative Bases

The regulations provide that an agency proposing some action must: "Rigorously explore and objectively evaluate all reasonable alternatives, and *for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.*" 40 C.F.R. § 1502.14(a) (emphasis added). The raison d'etre of this FEIS was to evaluate the environmental impact of locating C–5As at Westover and the alternative numbers in which they might be implemented there, including a "no action" alternative. It is abundantly clear from the record that the Air Force had previously reviewed the possibilities of placing the C–5As at the other bases mentioned and concluded that, for reasons having nothing to do with environmental impact—recruitment capability and cost of air base adaption—the aircraft would not be located at these other installations. *See Grazing Fields*, 626 F.2d at 1074 (recognizing that "the district court can use the administrative record to set the standard for how much discussion within the EIS a particular alternative merits, but cannot deem the unincorporated record to satisfy that standard.").

The Air Force's stated legal purpose for conducting the inquiry in this FEIS was to determine the proper course of action at Westover in light of its particular circumstances. It would, therefore, have been an exercise in futility for the Air Force to have conducted a detailed analysis of environmental impact at other bases solely for comparison's sake. This is consistent with the recognition in the case plaintiff submitted to the Court at oral argument, that "there is no need to consider alternatives of speculative feasibility." *Natural Resources Defense Council v. Callaway*, 524 F.2d 79, 93 (2d Cir.1975). For these reasons, it would not be in keeping with the purposes of NEPA to require of the defendants any more detail in this FEIS regarding the alternative bases than has

been supplied. *See* 42 U.S.C. § 4321; 40 C.F.R. § 1500.1(b) and (c) ("Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.... NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action."). As the First Circuit recognized in *Roosevelt:* "[n]o purpose would be served by requiring [the agency] to study exhaustively all environmental impacts at each alternative site considered once it has reasonably concluded that none of the alternatives will be substantially preferable to the proposed site." 684 F.2d at 1047.

Accordingly, the Court finds that defendants' brief statements in the FEIS as to why the other Air Force bases were not feasible alternatives to be sufficient, as these other bases were properly considered "alternatives which were eliminated from detailed study." 40 C.F.R. § 1504.14(a). The Court notes, too, that this area of policy decision making concerning military feasibility has a questionable status under the umbrella of judicial review.

2. Cold Climate

▇ Moving to plaintiff's concern that defendants failed to consider the increased cost of operating the C–5As in a cold weather climate, the Court must begin with the premise that this FEIS was not meant for comparison of Westover with other bases. It was instead conducted to determine the most environmentally considerate option *at Westover*, taking account of the relative needs of the Air Force. As the Court has found above, the FEIS adequately stated its reasons for eliminating the other bases from detailed study.

It is evident from the required brief discussion of the reasons for the elimination of these other bases as alternatives in the FEIS and the record as a whole, that the Air Force considered the various costs of the operation and maintenance of these aircraft at these other bases. Evidence of the Air Force's consideration of the cost and feasibility of cold climate operation is seen in certain memoranda and correspondence.

Memorandum of Col. William H. Welker dated June 5, 1984, Exhibit No. 1 to Defendants' Motion For Summary Judgment; letter to Representative Boland from Deputy Assistant Secretary of the Air Force, James F. Boatright, Exhibit No. 2 to Defendants' Motion For Summary Judgment; *see also* 10 U.S.C. § 9773(b) (recognizing the desirability of cold climate training). This demonstrates a non-environmental reason why the alternative of beddown at another base need not have been given detailed study in this FEIS. *See Grazing Fields,* 626 F.2d at 1074 (the court may use the record to determine the required scope of inquiry in an EIS).

▇ Furthermore, the regulations require consideration of a cost-benefit analysis in very limited circumstances. They state that: "For purposes of complying with the Act, the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and *should not be* when there are important qualitative considerations." 40 C.F.R. § 1502.23 (emphasis added). With this in mind, the Court finds that the Air Force's brief statements in the FEIS regarding the other bases and the various factors, including cost, adequately addressed any conceivable requirement of considering the cost of beddown at climatologically different locations.

B. *Air Pollution*

▇ In plaintiff's second motion for partial summary judgment, plaintiff takes issue with the manner in which the Air Force calculated air quality impacts in the FEIS. Again, defendants have responded to this motion in their cross motion for summary judgment.

In the area of evaluative methodology to be applied in EISes, the First Circuit has cogently reasoned:

Greater use of modern analytical techniques for calculating the possible consequences by agencies contemplating environmentally significant activities may be desirable ... but within wide limits, the final decision as to how much analysis is necessary in view of the available data

must be the agency's, subject to judicial review only for obviously incorrect results or methodology.

*Commonwealth of Massachusetts v. Andrus*, 594 F.2d at 886.

In evaluating potential air pollution impact in the FEIS, defendants compared the impact caused by the previously operated aircraft, C–130s, in the same respects as the C–5As. In this comparison defendants applied the same methodology in the evaluation of each aircraft. Taking all facets of the operation of each plane into account, the FEIS determined that the C–5As would cause less overall air pollution than the C–130s. This conclusion undoubtedly had to do with the fact that there had been sixteen C–130s stationed at Westover that flew for a much greater number of hours per week than the projected weekly flight time for the sixteen C–5As. Plaintiff does not directly attack this comparative form of analyzing the relative impact and it seems a valid method of gauging the extent of future impact from the operation of the aircraft. In fact, the Western Regional Office of the Massachusetts Department of Environmental Quality Engineering gave its approval to this method as indicated in the FEIS. This agency also predicted some increase in air pollution from C–130 operation to C–5A operation.

In attacking this evaluation, plaintiff points to a number of revisions defendants made in answering discovery requests as well as the evaluation's omission of consideration of the environmental impact caused by the ground testing of the C–5As' engines. Plaintiff also contends that the FEIS failed to consider the low flight level of the aircraft and the increased impact caused by that level of flight. Plaintiff goes on to hypothesize statistics for the true impact had these various differentials been taken into account. In doing so, it is apparent that some confusion might have arisen between the numbers supplied in the FEIS concerning the WMDC proposal, increasing the total number of flight hours, and statistics applicable to the C–5A proposals. At any rate, these calculations cannot be considered as anything more than conjecture or speculation, as plaintiff Valley Citizens has not noted that it has conducted any formal, scientific testing.

Defendants concede that certain aspects of the C–5A operation were not included in the FEIS, but argue that these omissions were insignificant. The Court agrees. This method, which was specifically given the imprimatur of a state agency, provides a valid basis of inquiry by comparing the proposed activity with a known related source, the previous C–130 activity. The fact that the comparison leaves out certain details such as ground engine testing cannot be considered fatal unless it is shown to be a significant part of the operation. *Conservation Law Foundation, ETC. v. Andrus*, 623 F.2d at 719 ("[E]ven if there is some minor deficiency in an environmental statement, the presence of such does not suffice to dispense with the traditional role of the court in balancing competing considerations.") This is consistent with the Court's limited review of these matters, prohibiting the requirement of "a degree of detail too exacting to be realized." *Grazing Fields*, 626 F.2d at 1074.

Accordingly, the Court finds that defendants have satisfied the requirement of making a "good faith effort," evaluating the necessary information in this FEIS with regard to air pollution impact from the proposed activity in a manner providing a basis upon which to make well informed decisions concerning the proposed activity.

## C. Noise Pollution Impact

■ Only defendants have moved for summary judgment on this issue. Plaintiff Valley Citizens opposes it contending that there are still genuine issues of material fact for trial. In support of its position, plaintiff relies in part on affidavits of both experts and approximately 1,535 citizens stating that they are "highly annoyed" by the C–5A noise. The main issue here is much the same as that involved with the air pollution impact inquiry: plaintiff challenges the methodology defendants used in determining the impact of the noise pollution that the C–5As would cause in their various proposed modes of operation.

In reviewing this matter, the rule of reason once again sets narrow limits on the Court. While there are varying expert opinions on the subject at issue, this alone does not necessarily create the dispute required to hold off summary judgment in a case such as this, governed by a confined scope of review. In accordance with the summary judgment standards as applied in light of the scope of review, the only inquiry the Court may conduct here is an examination of the record for a genuine issue in dispute as to whether the method implemented to determine the impact of noise pollution in the FEIS was one which defendants had a reasonable basis in choosing. As one court stated when faced with a similar question involving the adequacy of a noise analysis:

> When a court considers the sufficiency of an agency's environmental analysis, "the court is not to rule on the relative merits of competing scientific opinion...." The agency is entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances. The court's responsibility lies in assuring that the agency had before it all the data to make an informed decision that adequately took account of the important environmental concerns.

*Sierra Club v. United States Department of Transportation*, 753 F.2d 120, 129 (D.C. Cir.1985) (citation omitted). This is consistent with the main purpose of the Act, requiring agencies to consider environmental issues before taking any major action. *See* S.Rep. No. 296, 91st Cong., 1st Sess. (1969); H.R.Rep. No. 378, 91st Cong. 1st Sess. (1969); H.R.Conf.Rep. No. 765, 91st Cong., 1st Sess. (1969), *all reprinted in* 1969 U.S. Code Cong. & Admin.News 2751–73.

Plaintiff's contention is that the cumulative, twenty-four hour/yearly method of averaging the impact of the noise implemented in the FEIS, dilutes the impact's real nature when, in this instance, the aircraft flies in five-hour sorties involving a number of touch-and-go takeoffs and landings. Plaintiff argues that this evaluative method, while possibly sound in other flight situations where the activity is more continuous, does not provide a good measure in this situation because the true impact of the shorter flight time at lower altitudes is lost in the averaging.

Plaintiff's concern with the inaccuracy of the information gathered using this method is stated in its expert's, Dr. Richard L. Freyman's, first affidavit, thusly: "The problem is that despite the fact that this recommended methodology was used, it is possible, even likely, that the predicted number of people who will be 'highly annoyed' is inaccurate in this case." Dr. Freyman reiterates in his second affidavit that the main point he makes is "that the prediction of annoyance from the noise of the C–5As as written in the EIS is likely to be incorrect." This coincides with plaintiff's concern voiced in its brief that the FEIS identified only "approximately 700" persons as likely to be highly annoyed when, in fact, Valley Citizens had been able to find over 1,500 persons to say that they were highly annoyed with the current activity.

These observations neglect to take note of the statement in the FEIS that although 700 was the estimated number of persons who would be highly annoyed, the FEIS went on to state that: "A few additional persons residing in areas exposed to DNL levels [greater than] 65 dB may also be highly annoyed by aircraft noise." FEIS at viii. The FEIS also recognized that the noise that the aircraft would create "could interfere with activities in which verbal communication is important (such as classroom instruction, business conferences, and religious activities) and with listening to television and radio programs or recorded music." *Id.*

As noted above, the Court may not hold defendants to a degree of exactitude too high to be attained. *Grazing Fields*, 626 F.2d at 1074. Requiring precision in predicting long term noise pollution impact would be particularly absurd given the subjective, human element in any measure of annoyance. Plaintiff's expert concedes that there are no other known and well accepted methods of predicting aircraft

noise impact. Dr. Freyman does hypothesize about other possible methods, but mere conjecture is not enough to show that some other concocted analysis is so superior to the one chosen that the latter should be considered completely invalid. *See Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514 (a party opposing summary judgment must set forth specific facts showing that there is a genuine issue for trial and may not rest on speculation or conjecture). In addition, it is nonsensical to presume that the Air Force would be unaware of the proposed flying time and patterns for the C–5As when evaluating the data obtained through this analysis of noise impact. The FEIS presented both the information regarding the proposed flight schedules for the C–5As and the averaged cumulative noise impact data. The FEIS, therefore, fulfilled NEPA's goal of providing all significant and reasonably obtainable sources of information upon which to make a decision regarding the proposed action. The Court does not see fit to make defendants go further.

This is not to say that the Court does not recognize that there may be a good number more persons highly annoyed with this aircraft's presence than the FEIS predicted. The Court may only determine whether defendants acted in a reasonable manner in attempting to provide themselves with as much information as possible to make their decision. In this case, the Court cannot say that defendants acted wholly without the realm of reason in using this, the only known and accepted method for predicting noise impact. *See Sierra Club v. United States Department of Transportation,* 753 F.2d at 128–29 (recognizing the validity of cumulative noise level analysis methodology in determining whether an EIS should be conducted with regard to the placement of aircraft). Defendants cannot be said to have acted arbitrarily or capriciously.

## IV.

For all of the foregoing reasons, plaintiff's motions for partial summary judgment are DENIED and defendants' cross motion for summary judgment is ALLOWED.

Having reached the merits on all claims, the question of whether a preliminary injunction should issue is moot. *See also Ogunquit Village Corp. v. Davis,* 553 F.2d 243, 246–47 (1st Cir.1977) (recognizing that following completion of a project equitable relief based on NEPA violations may not be had without a showing of bad faith). Accordingly, plaintiff's motion for a preliminary injunction is DENIED.

Considering these rulings, defendants' motion to consolidate this case with Civil Action No. 88–0133–F, also entitled *Valley Citizens For A Safe Environment v. Aldridge,* 695 F.Supp. 614 (D.Mass.1988), is hereby DENIED.

It is So Ordered.